**Hollis Osborne WILCOTS, Appellant,**

v.

**Arecie Wilcots WIGGINS, Good Street Baptist Church Federal Credit Union, and Linda Shanklin, Appellees.**

No. 05–08–01521–CV.

Court of Appeals of Texas, Dallas.

Feb. 26, 2010.

Hollis Osborne Wilcots, Gatesville, TX, pro se.

Stephen L. Baskind, Kleiman Lawrence Baskind Fitzgerald LLP, Dallas, TX, for Appellee.

Before Justices MOSELEY, FITZGERALD, and LANG–MIERS.

## OPINION

Opinion By Justice LANG–MIERS.

Hollis Wilcots, acting pro se while incarcerated, sued his sister, Arecie Wiggins, Good Street Baptist Church Federal Credit Union, and its manager, Linda Shanklin,

for damages under the Texas Theft Liability Act. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 134.001–.005 (Vernon 2005). The trial court granted summary judgment in favor of the Credit Union and Shanklin and dismissed Wilcots's claims against his sister for want of prosecution. Wilcots appeals. We affirm.

## BACKGROUND

Wilcots received an inheritance of over $6000, presumably from his mother's estate. Because he was incarcerated, he executed a limited power of attorney in which he gave Wiggins authority to handle certain financial matters on his behalf. Pursuant to Wilcots's instructions, Wiggins opened an account at the Credit Union in Wilcots's name and signed the signature card "Arecie Wiggins P.O.A. for Hollis Osborne Wilcots." She withdrew a portion of the deposit immediately, leaving a balance of approximately $2500.[1] Over the next month or so, Wiggins withdrew the entire $2500 balance to handle personal matters. When Wilcots learned that his sister had depleted his account, he sued her for theft under the Texas Theft Liability Act. He alleged that the power of attorney only authorized her to open an account in his name and deposit funds into that account, not to withdraw those funds. He also sued the Credit Union and Shanklin under the Texas Theft Liability Act alleging that they knew the power of attorney was limited and that they allowed Wiggins to withdraw the funds anyway. He alleged that Shanklin conspired with Wiggins to commit theft and that the Credit Union, by not intervening, endorsed Shanklin's actions.

The Credit Union and Shanklin jointly moved for summary judgment, which the trial court granted. Wilcots twice moved for default judgment on his claim against his sister.[2] The appellate record does not contain a ruling on those motions. While the case was pending, Wiggins died. Wilcots wrote the clerk of the district court and advised the clerk pursuant to civil procedure rule 152 that Wiggins had died and asked the clerk to issue a *scire facias* for the administrator or executor of Wiggins's estate to appear and defend the lawsuit. Although the clerk's response is not in the appellate record, Wilcots purports to quote the letter, which apparently requested "additional paperwork" from him before the *scire facias* could issue. Wilcots wrote the clerk again and asked about the type of paperwork that was needed. He also inquired again about the status of the motion for default judgment. About three months later, the trial court signed an "Order Requesting Inmate Availability for Telephone Conference." It was directed to the senior warden at the Hughes Unit in Gatesville, Texas and asked that Wilcots be made available to participate in a telephone status conference on a certain date. Three days before the status conference was to occur, the trial court signed another order asking that Wilcots be made available for a telephone status conference on a different date about a week later. There is no reporter's record of a telephone conference in the appellate record. Four days after

1. The record indicates that Wiggins disbursed the money she immediately withdrew pursuant to Wilcots's instructions; he does not complain about those funds.

2. Simultaneously, Wilcots filed a *notice of appeal*. We questioned whether there was a final judgment in the case and Wilcots responded that there was not. *See Wilcots v. Good St. Baptist Church Fed. Credit Union*, No. 05–08–00119–CV, 2008 WL 1991702, at *1 (Tex.App.-Dallas May 9, 2008, no pet.) (mem. op.). By memorandum opinion, we dismissed the appeal for want of jurisdiction. *Id.*

the second scheduled telephone conference, the trial court signed a final judgment dismissing without prejudice Wilcots's claims against Wiggins for want of prosecution.

Wilcots brings two issues on appeal: (1) the trial court erred by granting summary judgment in favor of the Credit Union and Shanklin, and (2) the trial court abused its discretion by refusing to set a hearing or to rule on his motion for default judgment against Wiggins.

## SUMMARY JUDGMENT

In his first issue, Wilcots argues that the trial court erred by granting summary judgment in favor of the Credit Union and Shanklin because he raised genuine issues of material fact about whether they were liable for his sister's withdrawal of funds from his account for her personal use. He contends that Shanklin knew Wiggins did not have authority to withdraw the funds, but allowed her to do so anyway, and that the Credit Union endorsed Shanklin's conduct by remaining silent.

### Standard of Review

We review a trial court's summary judgment de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n,* 253 S.W.3d 184, 192 (Tex.2007). We will affirm a summary judgment if the record establishes that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See* TEX.R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). For a defendant to prevail on a traditional motion for summary judgment, it must either disprove at least one element of each of the plaintiff's claims as a matter of law or conclusively establish all elements of an affirmative defense. *Friendswood Dev. Co. v. McDade & Co.,* 926 S.W.2d 280, 282 (Tex.1996) (per curiam); *Shaun T. Mian*

*Corp. v. Hewlett–Packard Co.,* 237 S.W.3d 851, 854–55 (Tex.App.-Dallas 2007, pet. denied). If the movant meets its burden, then and only then must the nonmovant respond and present evidence raising an issue as to the material facts in question. TEX.R. CIV. P. 166a(c); *see Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 222–23 (Tex. 1999); *Shaun T. Mian Corp.,* 237 S.W.3d at 855.

In our review, we examine "the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion." *Sudan v. Sudan,* 199 S.W.3d 291, 292 (Tex.2006) (per curiam) (quoting *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex.2005)). We will affirm a traditional summary judgment if the evidence submitted in support of the motion and any response shows that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Shaun T. Mian Corp.,* 237 S.W.3d at 855.

### Applicable Law

Under the Texas Theft Liability Act, an individual, corporation, or other "person" who commits theft is liable for the damages resulting from the theft. TEX. CIV. PRAC. & REM.CODE ANN. §§ 134.001–.005. Theft is defined as "unlawfully appropriating property or unlawfully obtaining services" as described by certain sections of the penal code. *Id.* § 134.002. The section at issue here is section 31.03, which states

(a) A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property.

(b) Appropriation of property is unlawful if:

(1) it is without the owner's effective consent;

(2) the property is stolen and the actor appropriates the property knowing it was stolen by another; or

(3) property in the custody of any law enforcement agency was explicitly represented by any law enforcement agent to the actor as being stolen and the actor appropriates the property believing it was stolen by another.

TEX. PENAL CODE ANN. § 31.03 (Vernon Supp.2009).

### Discussion

In their joint motion for summary judgment, the Credit Union and Shanklin argued that the power of attorney and signature card authorized Wiggins to withdraw funds from Wilcots's account. They contended that Wiggins was the only person authorized to act on Wilcots's account, and that they were required to honor her requests to withdraw funds. As proof, they offered the power of attorney, depositor agreement, and signature card. Shanklin additionally argued that she was not individually liable to Wilcots because she acted at all times as manager of the Credit Union and there is no credible summary judgment evidence that she conspired with Wiggins to harm Wilcots. In her affidavit to support the summary judgment, she stated that she did not know the purpose for which Wiggins used the funds.

On appeal, Wilcots argues that the limited power of attorney clearly gave his sister only the power to deposit funds and not to withdraw them, and that the power of attorney expired upon the settlement of his mother's estate. He further contends that he raised a fact question about whether Shanklin conspired with Wiggins to allow Wiggins to withdraw funds for her personal use.

The power of attorney provides:

LIMITED POWER OF ATTORNEY

I, Hollis Osborne Wilcots, residing at Hughes Unit ... Hereby appoint Arecie Wilcots Wiggins ... as my attorney-in-fact ("Agent") to exercise the power and discretions described below.

My Agent shall have power and authority to act on my behalf to receive and disperse [sic] the following:

In the matter of closing settlement of the estate of Mae Belle Davis, disbursement of proportioned share of deceased mother's (Charlene Davis Wilcots) estate inheritance in the amount of $6,829.81 shall be disbursed in the following manner:

1. $2,500.00 to be placed in a financial institute savings account for me....

2. $1,500.00 paid to Arecie Wilcots Wiggins as contribution to repair updates to my father's house....

3. $2,829.81 to be sent to my account at the Texas Department of [C]riminal Justice inmate trust fund.

Conduct any business with any banking or financial institution with respect to, disbursement matters of the estate of Mae Belle Davis, limited to making deposits, negotiating or endorsing any checks or other instruments with respect to any such checks, money matters or vouchers payable to me by any person, firm, and/or corporation.

Purform [sic] any act necessary to deposit, negotiate, or transfer any moneytary [sic] funds, notes or draft of the United [S]tates of America, including U.S. Treasury securities.

This Limited Power of Attorney shall become effective immediately and shall continue until the matter of closing settlement of the estate of Mae

Belle Davis and disbursement of funds received has been completed as aforementioned above. This Limited Power of Attorney may be revoked by me at any time by providing written notice to my agent.

The power of attorney is signed by Wilcots, dated, and notarized.

■ Although Wilcots argues that Wiggins's "sole duty [under the power of attorney] was to deposit money into the account she started on [his] behalf," the unambiguous language of the power of attorney states otherwise. In the power of attorney, Wilcots gave Wiggins authority to perform "any act necessary to deposit, negotiate, or transfer any moneytary [sic] funds, notes or draft of the United [S]tates of America...." To "negotiate" means "to transfer or assign (as a check, bill of exchange, promissory note) to another by delivery or endorsement or both in return for equivalent value" or "to convert (as a check) into cash or the equivalent value." WEBSTER'S THIRD NEW INT'L DICT. 1514 (1981). In the ordinary sense of the term, to "negotiate" means not only to deposit funds, but also to cash checks. *See id.; Assoc. Carriages, Inc. v. Int'l Bank of Commerce,* 37 S.W.3d 69, 73 (Tex.App.-San Antonio 2000, pet. denied) (stating bank did not *cash checks* to corporation because bank could not know if person authorized *to negotiate* on behalf of business).

In addition, the evidence showed that Wiggins was the only person authorized to sign on the account and that the funds were withdrawn only by her. A bank has a duty to honor its depositor's checks if there are sufficient funds in the account, regardless of the purpose for which the check is given. *See* TEX. BUS. & COM.CODE ANN. §§ 4.401–.402 (Vernon 2002); *Mesquite State Bank v. Prof'l Inv. Corp.,* 488 S.W.2d 73, 75 (Tex.1972) (bank under duty to disburse funds on deposit in accordance

with directions of depositor); *White Rock Nat'l Bank of Dallas v. U.S. Fire Ins. Co.,* 562 S.W.2d 268, 274 (Tex.Civ.App.-Dallas 1978, writ ref'd n.r.e.) (relationship between bank and depositor is one of debtor and creditor and in absence of agreement to contrary, bank under duty to honor depositor's checks).

We conclude that the summary judgment evidence offered by the Credit Union and Shanklin conclusively established that Wiggins was authorized to negotiate funds in Wilcots's account and, as a result, they conclusively established that they were not liable for her withdrawal of those funds.

Wilcots contends that he raised a fact issue about whether Shanklin allowed Wiggins to unlawfully appropriate his funds. He cites a letter from his sister in which she stated that Shanklin "was aware I was withdrawing the funds for urgent needs regarding daddy's care and household needs. She was also aware that I was in a big financial bind, but had discussed with her my intentions and plans to replace the funds." As we have concluded, however, the power of attorney, deposit agreement, and signature card authorized Wiggins to withdraw funds from Wilcots's account, and nothing in the record shows that the Credit Union agreed that it would disburse funds from the account only for specific purposes. *See White Rock Nat'l Bank,* 562 S.W.2d at 273–74 (although president of bank knew purpose of deposit, no agreement between bank and depositor that bank would pay out money only for that specific purpose). We conclude that Wilcots's summary judgment evidence does not raise a genuine issue of material fact about whether Wiggins unlawfully appropriated funds in the account.

Wilcots also complains about a discrepancy in the records of his account. He contends that the initial deposit and membership fee noted in the Credit Union's

records are different from the initial deposit and membership fee on the receipt he received.[3] However, this discrepancy in the records concerning the membership fee does not change our conclusion that the power of attorney authorized Wiggins to withdraw funds from the account.

We conclude that the trial court did not err by granting summary judgment in favor of the Credit Union and Shanklin. We resolve appellant's first issue against him.

## MOTION FOR DEFAULT JUDGMENT

 In his second issue, Wilcots argues that the trial court erred when it failed to set a hearing on his motion for default judgment and to rule on the motion. Wilcots does not challenge the dismissal for want of prosecution. We conclude that Wilcots did not preserve this issue for our review.

To preserve a complaint for appellate review, a party must make the complaint to the trial court by a timely request, objection, or motion. TEX.R.APP. P. 33.1(a)(1). Preservation also requires one of three things: (1) an express ruling by the trial court, (2) an implicit ruling by the trial court, or (3) a refusal to rule by the trial court, coupled with an objection to that refusal by the complaining party. TEX.R.APP. P. 33.1(a)(2). The appellate record does not contain an express ruling on Wilcots's motion for default judgment, nor does it contain a refusal to rule coupled with an objection by Wilcots to that refusal, if any. Further, Wilcots does not argue that the dismissal constituted an implicit ruling by the trial court. *See Uni-*

*fund CCR Partners v. Smith,* No. 05–07–01449–CV, 2009 WL 2712385, at *1–2 (Tex. App.-Dallas Aug. 31, 2009, pet. filed) (mem.op.); *AIS Servs., LLC v. Mendez,* No. 05–07–01224–CV, 2009 WL 2622391, at *1–2 (Tex.App.-Dallas Aug. 27, 2009, no pet.) (mem.op.). Consequently, we conclude that this issue is not preserved for our review.

We resolve appellant's second issue against him.

## CONCLUSION

We affirm the trial court's judgment.

---

3. The Credit Union's records show an initial deposit of $6829.81, a membership fee of $5, a share withdrawal on the same day in the amount of $4329, leaving a balance of $2495.81. On the receipt that Wilcots received, it shows a share balance in the amount of $2500 and a $30 membership fee. He argues that this discrepancy "further ad-

vance[s] Shanklin's liability." We note, however, that the $6829.81 corresponds to the total of the funds listed in the power of attorney, and that the $4329 withdrawn from the account on the day it was opened corresponds to the disbursements listed in the power of attorney.