Jeffrey NELSON, Alfred P. Schoelen, Jr., Timothy Stecker, David Kattner and Walter Clifton, Appellants

v.

Albert PAGAN a/k/a Nicolo Novello, Shana Lopez, Trey Garrison, D Magazine Partners, LP d/b/a D–Magazine, Allison Media, Inc., Magazine Limited Partners, L.P., and DMAG, Inc., Appellees.

No. 05–09–01380–CV.

Court of Appeals of Texas, Dallas.

Aug. 8, 2012.

David A. Schiller, John D. Exline, Elisse V. Woelfel, Schiller Exline, PLLC, Plano, TX, for Appellant.

Donald C. Templin, Jason P. Bloom, Charles M. Jones, David H. Harper, J., Haynes and Boone, LLP, Dallas, TX, for Appellees.

Before Justices MORRIS, FRANCIS, and LANG–MIERS.

## OPINION

Opinion By Justice FRANCIS.

Jeffrey Nelson, Alfred P. Schoelen, Jr., Timothy Stecker, David Kattner, and Walter Clifton brought suit for defamation and other causes of action arising out of an article published in *D Magazine*. The trial court granted the motion for summary judgment of Albert Pagan a/k/a Nicolo Novello, Shana Lopez, Trey Garrison, D Magazine Partners, LP d/b/a D–Magazine, Allison Media, Inc., Magazine Limited Partners, L.P., and DMAG, Inc. We affirm the trial court's judgment.

At all times relevant to this appeal, appellants were Dallas police officers. The June 2007 issue of *D Magazine,* first published on May 23, 2007 by appellees D Magazine Partners, LP d/b/a D–Magazine, Allison Media, Inc., Magazine Limited Partners, L.P., and DMAG, Inc. (Media Appellees), included an article by appellee Garrison entitled, "Minus One Good Cop" (Article). The copy of the Article as posted on the magazine's website was entitled, "How a Rookie Exposed a Ring Inside DPD."

The "good cop" and "rookie" referenced in the titles was appellee Shanna Lopez, a March 2006 graduate of the Dallas Police Academy who was dismissed from the Dallas Police Department within a year of her graduation. She sought out the Media Appellees to investigate and report on her belief that she was dismissed because, in the words of the Article, she "snitched on" appellant Kattner, her first supervisor. According to the Article, during a conversation with another supervisor, Lopez inadvertently exposed Kattner's practice of using the "AIS system," a database of criminal records, to write bogus tickets to "street-level criminals." After this conversation, Lopez's performance evaluations "started slipping" and she was ultimately dismissed.[1]

The Article went on to state "it's not just Lopez's word" and described a "rare 'blue on blue' complaint" made by appellee Novello, a fellow police officer, against appellants Nelson, Stecker, and Schoelen. Nelson, Stecker, and Schoelen were described in the Article as "Kattner's buddies" and "'old heads' or veterans," who engaged in a "phony ticket scheme, abuse of suspects, falsification of evidence, and misuse of federal resources to make bogus arrests." According to the Article, Kattner and "his buddies" used the AIS database to obtain information (such as date of birth and address) on low-level criminals on their beat and would then write them tickets for misdemeanors-pedestrian in the roadway, manifesting for the purpose of prostitution, possession of drug paraphernalia. The officers would put on the tickets "refused to sign" or "signed at large." The tickets were mailed, but because the criminals were for the most part transient, they rarely received them, which led to arrest warrants and ultimately bigger activity numbers for the arresting officers. That was important because, according to the Article, Dallas police are evaluated on the basis of their daily activity reports and accrue one point for each activity. The better an officer's numbers, the more quickly he or she advanced. The Article alleged the officers found a way to "game" the activity points system by using the AIS database to write bogus tickets to unknowing suspects.

Appellee Novello was quoted at length in the Article as "the only cop willing to talk on the record" about these practices. The Article reported that "Novello ... says their tactics go a lot further than just writing bogus tickets and signing them at large." Novello said the officers "detain these people and manufacture the reasons." According to Novello, they generated "activity numbers on the backs of the disenfranchised—the whores, the street-level drug users, the people no one cares about. Meanwhile, there's real crime happening out there. But they just get off on abusing these women. These guys take your personhood. They keep you perpetually dirty." The Article went on to explain that Novello's complaint was being

---

1. The Article alleged that appellant Clifton was involved in deciding that Lopez "had to be run out" of the department.

investigated by "[a] special five-lieutenant panel, along with the Internal Affairs and Public Integrity departments." The Article concludes with a discussion of Lopez's unsuccessful efforts to obtain another job in law enforcement, as well as her desire to be vindicated, "to let them know that they can't do this and get away with it."

Other than the Article, the subject matter was put out to the public in other ways. On May 30, 2007, Garrison was interviewed on KRLD radio. He urged listeners to purchase a copy of the June 2007 issue of *D Magazine* containing his article, and made additional statements critical of appellants. Appellees published additional information on their blog, "Front Burner." Appellants complain of fourteen blog posts between May 30, 2007 and July 7, 2008 by Garrison or by *D Magazine* editors Tim Rogers and Eric Celeste. On December 17, 2007, for example, Garrison published a post entitled, "DMN Finally Figures out Fake Ticket Scheme." Garrison included a link to the Article as well as a summary of his "story on a cabal of dirty DPD cops who were writing phony tickets, making people sign blank tickets, and making bogus arrests." He criticized the *Dallas Morning News* for failing to "understand the full extent of what was going on" for six months after the Article appeared, as well as failing to give *D Magazine* credit for the original story. The blog post included the above-quoted paragraph from the Article about "Kattner and his buddies." On December 18, 2007, Garrison followed up with a post entitled, "Ticket Scheme Cops Facing Termination?" reporting that "[w]e're hearing from a number of sources" that Nelson, Stecker, and Schoelen "are scheduled to be fired today." The post included an update stating that disciplinary proceedings would not take place until after "a special hearing set for Jan. 8." The update concluded, "[a]ccording to a separate source, the assistant chief in charge of the matter is/was recommending termination." This post also included a link to the Article. Subsequent posts announced the firings of Nelson and Schoelen, the ten-day suspension of Stecker, Lopez's readmission to the police academy, and the overturning of Clifton's five-day suspension.

Appellants Nelson, Schoelen, Stecker, and Kattner brought suit on May 30, 2008, alleging claims for defamation, tortious interference with employment, and intentional infliction of emotional distress. Appellant Clifton joined the suit as a plaintiff on July 11, 2008. Appellees filed a motion for summary judgment asserting that (1) appellants' claims based on statements made before May 30, 2007 were barred by the one-year statute of limitations; (2) the claims were barred because appellants were public officials and the statements were not made with actual malice; (3) the statements were based on information contained in public records; (4) claims against the Media Appellees were barred by section 73.002 of the Texas Civil Practice and Remedies Code; (5) the factual statements made were true, and the non-factual statements were non-actionable opinions; and (6) claims for intentional infliction of emotional distress and tortious interference with employment were barred as a matter of law. The trial court granted the motion on August 14, 2009, without specifying the grounds.

Appellants raise three issues on appeal. First, they contend the trial court erred in denying their motion for continuance. Second, they maintain the trial court erred by failing to sustain their objections to the summary judgment affidavit of Trey Garrison. Third, appellants argue the trial court erred by granting appellees' summary judgment motion and, in multiple subparts, refute each ground presented in the motion and outlined above.

We begin with appellants' complaint that the trial court erred by denying their motion for continuance. The record shows the trial court granted appellants' motion in part, allowing appellants three months to depose additional witnesses before the summary judgment hearing. Appellants' first issue actually challenges the failure of the trial court to continue the summary judgment hearing until Garrison disclosed the identity of his confidential sources for the Article. In addition to the sources named and quoted in the Article, Garrison contends he received information from at least thirteen other persons whose identities he refused to disclose.

In *Dallas Morning News Co. v. Garcia*, 822 S.W.2d 675, 678 (Tex.App.-San Antonio 1991, orig. proceeding), our sister court recognized "a qualified First Amendment privilege against compelled disclosure of confidential information possessed by a journalist."[2] To establish this privilege, the party resisting discovery is required to produce supporting evidence. *Id.* at 679.

■ Here, Garrison offered his affidavit in response to appellants' motion to compel. Garrison stated he relied on confidential sources in preparing the Article, including "at least six persons whom Plaintiffs arrested or to whom Plaintiffs issued citations," "at least five persons who had not been cited or arrested by Plaintiffs, but who claimed to have witnessed Plaintiffs' activities," "a night clerk at a 7–11 store frequented by Plaintiffs," and "various officers with the Dallas Police Department." Garrison testified he agreed to maintain the confidentiality of these sources and not to disclose their identities in the Article. He also said that while some of the confidential sources were used to corroborate information he had obtained from other sources, he did attribute statements and information to certain confidential sources in the Article. This evidence was sufficient to meet the burden required under *Garcia*. *See id.* at 679 (affidavits of three reporters who authored article were sufficient to meet burden to establish privilege; reporters testified "they assured certain news sources that they would keep their identities and certain information provided confidential").

■ Once the journalist's burden has been met, the burden shifts to the party

2. Since 2009, Texas law has recognized a statutory privilege for journalists regarding disclosure of confidential sources. *See* Tex. Civ. Prac. & Rem.Code Ann. § 22.023 (West Supp.2011) (journalist may not be compelled to disclose certain information). This law, however, applies only to information obtained after May 13, 2009, the effective date of the Act. Act of April 28, 2009, 81st Leg., R.S., ch. 29, § 3, 2009 Tex. Gen. Laws 49, 54. *See also In re Rabb*, 293 S.W.3d 865, 867 (Tex.App.-Dallas 2009, orig. proceeding) (in criminal proceeding, section 22.023 cannot be applied to information obtained prior to act's effective date). The information in question here was obtained long before that date; consequently, the statutory privilege does not apply. Prior to the statute, Texas courts of appeals did not agree on whether a journalist's privilege existed in civil cases. *Compare, e.g., Garcia*, 822 S.W.2d at 678 (recognizing qualified First Amendment privilege against compelled disclosure of confidential information possessed by journalist) *with Dolcefino v. Ray*, 902 S.W.2d 163, 164 (Tex.App.-Houston [1st Dist.] 1995, orig. proceeding) (per curiam) (declining to decide whether privilege exists, but noting that rules of evidence did not provide any privilege for journalists even after court opinions recognized one). Generally, however, courts agreed that if any privilege existed, it protected the identity of confidential sources. *See, e.g., In re Union Pac. R.R. Co.*, 6 S.W.3d 310, 312 & n. 4 (Tex.App.-Houston [14th Dist.] 1999, orig. proceeding) (per curiam) ("Case law recognizing a qualified reporter's privilege in civil cases do so only with respect to protecting the identity of *confidential* sources."). We therefore rely on *Garcia* in considering appellants' issue regarding Garrison's confidential sources.

seeking the discovery to produce substantial evidence that (1) the statement attributed to the informant was published and is false and defamatory; (2) reasonable efforts have been made to learn the informant's identity by alternative means, but no other reasonable means is available; and (3) knowledge of the informant's identity is necessary or critical to proper preparation and presentation of the case. *Id.* at 680 (citing *In re Selcraig,* 705 F.2d 789, 792 (5th Cir.1983)).

■ We conclude appellants did not establish that reasonable efforts had been made to learn the confidential sources' identity by alternative means. Although they took Garrison's deposition and established Garrison refused to reveal the identities of his sources, they produced no other evidence of their efforts to determine the sources' identities through subpoenas, deposition notices, or other investigation. In addition, Garrison quoted "[a] member of the investigation team from the DPD Public Integrity unit" in the Article, and the trial court's order granting the continuance explicitly permitted appellants "to subpoena the depositions of at least two members of the Public Integrity Unit of the Dallas Police Department." The record does not show appellants sought or conducted these depositions. The trial court's order reflects the trial court attempted to balance the parties' competing interests in the context of the constitutional issues involved. *See id.* at 678. We conclude the trial court did not abuse its discretion in its ruling on appellants' motion for continuance. *See State v. Wood Oil Distrib., Inc.,* 751 S.W.2d 863, 865 (Tex.1988) (stating decision to deny motion for continuance within trial court's sound discretion). We overrule appellants' first issue.

In their second issue, appellants contend the trial court erred by failing to sustain their objections to Garrison's summary judgment affidavit. The objections arise out of appellants' argument that Garrison's affidavit could not be "readily controverted" because of its reliance on confidential sources. *See* TEX.R. CIV. P. 166a(c) ("A summary judgment may be based on uncontroverted testimonial evidence of an interested witness ... if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted.").

■ We review a trial court's decision to admit or exclude summary judgment evidence under an abuse of discretion standard. *Double Diamond, Inc. v. Van Tyne,* 109 S.W.3d 848, 852 (Tex.App.-Dallas 2003, no pet.) (citing *Owens-Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex. 1998)). In *Casso v. Brand,* 776 S.W.2d 551, 558 (Tex.1989), the court discussed the "could have been readily controverted" requirement of rule 166a(c) in the context of a defamation claim made by a public figure. There, the court explained the term does not mean the evidence could have been easily and conveniently rebutted; it means that testimony at issue is of a nature which can be effectively countered by opposing evidence. *Id.* If the affiant or deponent's credibility is likely to be a dispositive factor in resolving the case, then summary judgment is inappropriate. On the other hand, if the nonmovant must likely come forth with independent evidence to prevail, then summary judgment may well be proper in the absence of such controverting proof. *Id.*

The court overruled two of its earlier decisions holding that affidavits of interested journalists regarding their state of mind could not be "readily controverted" under rule 166a(c). *Id.* at 557–59. The court noted that under the previous case law, "summary judgment is virtually im-

possible to obtain in any action for defamation." *Id.* at 557. The court concluded that "our courts do not ordinarily deny otherwise appropriate summary judgment motions because of a subjective determination that the movant's proof cannot be readily controverted. Neither should they do in a defamation case involving a public official or public figure." *Id.* at 559.

■ As we will discuss below, Garrison's affidavit was submitted to negate the "actual malice" element of appellants' defamation claims. *See Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 420 (Tex.2000). The issue is whether the defendant published the statement with knowledge of its falsity or reckless disregard for its truth. *Id.* Proof of actual malice requires "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Casso*, 776 S.W.2d at 558 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)). In *Casso*, the court concluded some of Casso's summary judgment proof was sufficient to negate actual malice, and some of it was not. *Id.* at 559. Where Casso testified "he did not believe the allegations were false and did not act with reckless disregard as to their truth or falsity in repeating those allegations," summary judgment was proper. Where Casso's proof provided "no information as to Casso's knowledge that the statements were not false or were not made with reckless disregard to their truth or falsity," it was not sufficient. *Id.* In *Huckabee*, the supreme court further explained that to negate actual malice, an affidavit from an interested witness "must establish the defendant's belief in the challenged statements' truth and provide a plausible basis for this belief." *Huckabee*, 19 S.W.3d at 424.

■ We conclude the trial court did not abuse its discretion in failing to sustain appellants' objections to Garrison's affidavit. *See Double Diamond, Inc.*, 109 S.W.3d at 852. According to the affidavit, Garrison began his work on the Article with Lopez's allegations about her termination, but during his research, "encountered numerous allegations" regarding appellants' activities as police officers, "including allegations that Plaintiffs were engaged in a scheme of filing at large citations, forcing citizens, including prostitutes and homeless persons, to sign blank citations, filling in false occupations on citations, and being abusive toward prisoners." His affidavit describes his research, including interviews with Lopez and Novello, requests for and review of arrest reports and ticket citations, and review of a March 21, 2007 article in the *Dallas Morning News.* Garrison repeatedly testified in the affidavit that he believed the information he acquired from these sources was true at the time he wrote the Article and "today."

■ Garrison did testify about his reliance on confidential sources to corroborate Lopez's allegations, and did not specifically state which of Lopez's allegations were corroborated by which particular source. Under *Casso* and *Huckabee*, however, this testimony is probative of Garrison's "plausible basis" for belief in Lopez's statements, as well as whether he "in fact entertained serious doubts as to the truth of his publication." *See Huckabee*, 19 S.W.3d at 424; *Casso*, 776 S.W.2d at 558. "The focus of the actual-malice inquiry is the defendant's state of mind during the editorial process." *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 174 (Tex.2003). Whether the affidavit was enough to meet Garrison's burden of proof to establish absence of malice for summary judgment is a different question, one we

discuss below. Here, we conclude the trial court could admit Garrison's affidavit as relevant, non-hearsay evidence regarding his state of mind. *See Double Diamond, Inc.,* 109 S.W.3d at 853. We overrule appellants' second issue.

In their third issue, appellants contend the trial court erred in granting appellees' motion for summary judgment and challenge each of the grounds raised in the motion.

▪ We review de novo the trial court's granting of a motion for traditional summary judgment. *Frost Nat'l Bank v. Fernandez,* 315 S.W.3d 494, 508 (Tex.2010), *cert. denied,* — U.S. —, 131 S.Ct. 1017, 178 L.Ed.2d 829 (2011). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex.2002). We will affirm a summary judgment if the record establishes there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215–16 (Tex.2003). For a defendant to prevail on a traditional motion for summary judgment, it must either disprove at least one element of each of the plaintiff's claims as a matter of law or conclusively establish all elements of an affirmative defense to the claims. *Friendswood Dev. Co. v. McDade & Co.,* 926 S.W.2d 280, 282 (Tex.1996); *Wilcots v. Wiggins,* 306 S.W.3d 947, 949 (Tex.App.-Dallas 2010, no pet.). If the defendant establishes its right to summary judgment as a matter of law, the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact, thereby precluding summary judgment. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979).

Because the trial court's order does not specify the grounds for its summary judgment, we must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review had merit. *Provident Life & Accident Ins. Co.,* 128 S.W.3d at 216.

▪ Because the ground of actual malice is dispositive, we begin with it. To recover for defamation, a public figure or public official must prove the defendant published a false and defamatory statement with "actual malice." *See New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Huckabee,* 19 S.W.3d at 420. Appellants concede they are public figures for purposes of their defamation claims. To establish actual malice, the public-figure plaintiffs must prove appellees published the article with either knowledge of the falsity or reckless disregard for the truth. *See Hearst Corp. v. Skeen,* 159 S.W.3d 633, 637 (Tex.2005) (per curiam). Knowledge of falsity is a relatively clear standard, but reckless disregard is much less so. *Id.* Reckless disregard is a subjective standard, requiring evidence that appellees entertained serious doubts as to the truth of the article at the time it was published. *See id.* Libel defendants are entitled to summary judgment under Texas law if they can negate actual malice as a matter of law. *Id.*

Appellees offered several affidavits in support of their summary judgment motion. Garrison offered his own affidavit as summary judgment proof that he did not act with actual malice. He described his research for the article and, in addition to interviews of Lopez and Novello, testified he relied on his confidential sources to corroborate Lopez's allegations. Garrison generally described his confidential sources; for example, he stated that he interviewed "at least six persons whom

Plaintiffs arrested or to whom Plaintiffs issued citations." He also stated he reviewed arrest reports, ticket citations, and activity reports obtained from the Dallas Police Department, the Dallas City Clerk's Office, and a website, but conceded he "has been unable to locate" copies of the citations he received from the City Clerk. Garrison cited to articles in the *Dallas Morning News* regarding the police department investigation of Schoelen, Stecker, and Nelson.[3] Garrison testified that "[a]t the time all of the statements in question were made, and at all other relevant times, I believed them to be true and had no knowledge that any of the statements were false." In the last paragraph of his affidavit, Garrison testified his belief was "based on my many witness interviews, a thorough review of publicly available information, my review of articles in various news sources ... and true and impartial accounts of the proceedings before the IAD."

In addition to Garrison's affidavit, appellees submitted the affidavits of Lopez, Novello, Celeste, and Rogers to support their motion for summary judgment on the issue of lack of actual malice. Lopez testified about her work with Kattner, her interview with Garrison, her sworn statement to the Internal Affairs Division, and her review of articles from other media sources. She said she believed the "statements in question" were true and had no knowledge they were false. The statements were made on her personal knowledge gained from "my work at Central Patrol Division, my direct observation of Plaintiffs' conduct while on duty as Dallas Police Officers, and my review of citations and arrest reports prepared by Plaintiffs."

Novello's affidavit described the complaint he had filed with the Dallas Police Department's Internal Affairs Division regarding "improper behavior while on duty" of three of the appellants. He testified about his interview with Garrison and stated he obtained and reviewed police department records regarding the investigation that followed his complaint. Novello recounted the results of the investigation. Novello said he believed the statements in question were true and had no knowledge they were false. He further stated his belief was based on his personal observations of appellants, his conversations with others who had observed appellants' activities as police officers, and his review of public records, including the records of the internal affairs investigation.

Celeste and Rogers testified they were editors of *D Magazine*. Celeste said he authored a May 28, 2008 posting on the Front Burner website. He stated that before he made the posting, he reviewed the Article and the *Dallas Morning News* article that was the subject of his posting, and had discussions with Garrison about Garrison's research and interviews for the Article. Rogers made three of the postings on the Front Burner website. Rogers and Garrison discussed Garrison's witness interviews and the documents Garrison had collected prior to the publication of the Article. His postings on the website were based on his discussions with Garrison, his review of documents provided by Garrison, and his review of the Article and related articles in the *Dallas Morning News.* Both Celeste and Rogers said they believed their statements to be true and had no knowledge the statements were false.

---

**3.** Only the first of these articles, dated March 21, 2007, would be relevant to the question of actual malice in the Article; the remainder were written after the Article was first published, and would be relevant only to blog posts that followed. *See Forbes, Inc.,* 124 S.W.3d at 172 (actual malice inquiry focuses on defendant's state of mind at time of publication).

Both stated they based their belief on their review of the Article and the other sources described in their affidavits.

█ All of these affidavits were made by interested witnesses. As noted above, the affidavits "must establish the defendant's belief in the challenged statements' truth and provide a plausible basis for this belief" in order to negate actual malice as a matter of law. *Huckabee,* 19 S.W.3d at 424. Although constitutional considerations protect Garrison from revealing his confidential sources, these considerations do not relieve him of meeting his burden on summary judgment to negate actual malice as a matter of law. *See id.* at 420 (defendants can obtain summary judgment only if they conclusively negate one of elements of plaintiff's claim). Here, in their affidavits, the witnesses stated their belief in the truth of the statements, and described the sources that provided the basis for their belief. We conclude these affidavits were sufficient to meet appellees' burden of presenting evidence they did not publish the statements with knowledge of their falsity or reckless disregard for their truth. *See id.*

The burden shifted to appellants to present evidence to raise a fact issue on actual malice. *Id.* Appellants were required "to offer specific, affirmative proof" to show appellees "either knew the publication was false or entertained serious doubts as to its truth." *HBO v. Harrison,* 983 S.W.2d 31, 42 (Tex.App.-Houston [14th Dist.] 1998, no pet.). While appellants could not depose Garrison's confidential sources, they did depose each of the affiants identified above. From these depositions, appellants identified evidence they contend raises a fact issue on actual malice. They argue appellees were not able to identify any specific examples or incidents of false arrests, issuing citations without probable cause, falsifying evi-

dence, or corrupt conduct by appellants. Appellants contend Garrison did not review appellants' arrest reports, despite Rogers's testimony that Garrison should have done so. They also point to evidence that the defamatory statements in the Article were not fact-checked, and they contend that appellees' investigation was grossly inadequate. They argue that Garrison was not credible, having been fired by one of the appellees for "incidents of plagiarism." They contend that Novello had little opportunity to observe any law enforcement activity by any of the appellants and did not review their arrest records, and was not credible because of previous conflicts he had with some of the appellants. And they contend that appellees' affidavits are not based on personal knowledge of facts, but rather are founded on "guesswork, assumptions, unrealized expectations that one of the other Appellees would actually dig up some evidence and facts to support what amounted to mere conjecture, and on pure speculation that arrest records and citation records which were never obtained or analyzed would substantiate the truth of the libelous statements against Appellants."

█ Appellants also argue that a fact issue on actual malice exists because they cannot test the credibility of Garrison's confidential sources. They complain Garrison did not specify which of Lopez's and Novello's statements were corroborated, which confidential source provided the corroboration, or what information was provided. Appellants contend the ability to question the confidential sources is especially important where the sources were used not only for corroboration, but also as the only basis for statements made in the Article.

This case is similar in many respects to *Hearst Corp.* Defendants published an article criticizing the Smith County criminal

justice system, describing "aggressive prosecutors" who "have been accused of serious infractions" including "suppressing evidence, encouraging perjury, and practicing selective prosecution." *Id.* at 636. Three Smith County prosecutors brought suit for defamation, alleging the article was false and malicious. *Id.* Plaintiffs contended defendant Moore, the author of the article, knew the article was false "because the ten cases discussed in the article were a relatively insignificant sample from which to conclude that the Smith County D.A.'s office routinely engaged in unethical practices to win convictions." *Id.* at 637. When plaintiffs' attorney pointed out at Moore's deposition that these cases amounted to only .04% of the total indictments in the relevant time period, Moore admitted he did not conduct any statistical analysis, but "had only focused on the problem cases he had discovered." Plaintiffs argued defendants "purposefully avoided the truth, relied on dubious information from bias[ed] sources, deviated from professional standards of care, and were motivated to fabricate." *Id.* The supreme court rendered judgment for the defendants, concluding their motion for summary judgment should have been granted because plaintiffs failed to raise a fact issue on actual malice. *Id.* at 639.

The court stated "[a] failure to investigate fully is not evidence of actual malice; a purposeful avoidance of the truth is." *Id.* at 637. The court rejected the contention that Moore purposefully avoided the truth by failing to review every indictment during the prosecutors' service or by failing to discuss a larger number of cases and stated these contentions were not evidence Moore knew the article contained false statements. *Id.* Evidence established Moore spent five months researching the article, interviewed parties on both sides of the issue including the plaintiffs, and reviewed the court records of the cases he

discussed in the article. *Id.* at 638. Moore reviewed "multiple statements in court-filed documents" alleging prosecutorial misconduct. *Id.* at 639. Moore also relied on anonymous sources to corroborate the criticisms he made in the article. *Id.* at 638–39. Most of his corroborating sources conditioned their responses on anonymity, but a few allowed their names to appear in the article. *Id.* at 639. The court concluded, "Moore's article was based on many sources that corroborated the criticisms, which his research showed were not inherently improbable," therefore, no fact issue existed as to whether Moore relied on "obviously doubtful" sources of information. *Id.* The court also rejected plaintiffs' contention that the article "was biased and failed to impartially give a balanced account of the information it discussed." *Id.* Although the plaintiffs offered expert testimony on this point, the court stated "evidence that the article was written 'from a particular point of view, even when [the article is] hard-hitting or sensationalistic, is no evidence of actual malice.'" *Id.* (quoting *Huckabee,* 19 S.W.3d at 425).

As in *Skeen,* appellants do not so much challenge all of the specific facts underlying the stories in the Article and the blog posts—they offered their own testimony that on occasion they issued at-large citations, used the AIS database to obtain information, and were disciplined by the Internal Affairs Division—but strenuously object to the sensationalistic conclusions drawn by appellees, especially Garrison and Novello, based on inadequate research and "mystery" witnesses appellants could not cross-examine. Appellants testified they were not "part of a hornet's nest of crooked cops," had not participated in "years of civil rights abuses," had never been "thugs," and were not involved in a "ticket writing/bogus arrest scam," and

they denied other similar conclusions drawn in the Article and the blog posts. Appellants argue appellees could not provide a single specific instance of the conduct described in the Article, such as a false arrest or falsified evidence. They contend that without such specific facts, appellees can publicly accuse any public official of any corrupt or criminal act without any evidence, say they "believe it to be true," and they are "home free under the protective shield of the 'actual malice' standard." Relying on *St. Amant*, 390 U.S. at 732, 88 S.Ct. 1323, they contend they have raised a fact issue regarding whether appellees' publication of the Article and the blog posts were made in good faith and whether appellees entertained serious doubts as to the truth of the publication.

In both *St. Amant* and in *Skeen*, the courts ultimately concluded that actual malice had not been established. *St. Amant*, 390 U.S. at 732–33, 88 S.Ct. 1323; *Skeen*, 159 S.W.3d at 639. We reach a similar conclusion here. The record shows Garrison sought to corroborate the story first related to him by Lopez. He conceded in the Article that "if it were just [Lopez's] word, it wouldn't amount to much," because "[a]fter all, she is a disgruntled former employee, and her official dismissal indicates she couldn't hack it." But in investigating Lopez's allegations, Garrison identified Novello, who had made an internal complaint including similar allegations. Novello had no connection with Lopez, and was an identified source who provided information for the Article. Garrison reviewed a *Dallas Morning News* article reporting on Novello's internal complaint. Garrison obtained arrest reports through an open records request to the Dallas Police Department as well as citations from the Dallas City Clerk. He said none of these sources contradicted Lopez's allegations, and he believed the information obtained from these sources was true.

We acknowledge most of the cases granting summary judgment on actual malice do not involve a media defendant's reliance on confidential sources. Appellants question whether the confidential sources exist at all, and if so, whether they actually corroborated any information from any identified source. But as in *Skeen*, the confidential sources here are not Garrison's only or even his primary sources. *See Skeen*, 159 S.W.3d at 639. Instead, he relied on them to corroborate information he obtained from Lopez, Novello, police department and city records, and a newspaper article he considered reliable. Equally important, the issue is whether Garrison acted in reckless disregard of the truth of the statements he made in the Article, not whether a particular underlying source was truthful. *See Skeen*, 159 S.W.3d at 637. As noted above, appellants were permitted to depose witnesses who may have been able to discredit at least some of Garrison's confidential sources. Appellants did not offer any such evidence, or other evidence that Garrison knew his sources were "obviously dubious." *See id.* at 638.

At trial, a plaintiff must prove by clear and convincing evidence that the defendant acted with actual malice. *Casso*, 776 S.W.2d at 558. Appellants were required "to offer specific, affirmative proof" to show that appellees "either knew the publication was false or entertained serious doubts as to its truth" to prevent summary judgment. *Harrison*, 983 S.W.2d at 42. Their denials of the Article's conclusions and arguments regarding inadequate investigation and lack of specific detail are insufficient to meet this burden. We conclude that when the burden of proof shifted to appellants, they did not raise a fact issue regarding whether appellees acted in reckless disregard for the truth or falsity of the statements made in the Article and

the blog posts, as required to defeat summary judgment on the issue of actual malice. *See Skeen,* 159 S.W.3d at 637.

Because we have concluded that summary judgment was appropriate on the issue of actual malice, we need not consider appellants' arguments regarding the statute of limitations, substantial truth, the availability of information in public records, or the application of section 73.002(b)(1) of the Texas Civil Practice and Remedies Code. *See HBO v. Huckabee,* 995 S.W.2d 152, 163 (Tex.App.-Houston [14th Dist.] 1998) (where appellant negated the element of actual malice, court of appeals need not consider other grounds raised in motion), *aff'd, Huckabee v. Time Warner Entm't Co.,* 19 S.W.3d 413 (Tex. 2000).

 We must, however, address whether summary judgment was proper on appellants' causes of action for intentional infliction of emotional distress and tortious interference with employment. *See Gatling v. Perna,* 788 S.W.2d 44, 47 (Tex.App.-Dallas 1990, writ denied) (summary judgment proper only if nonmovant cannot succeed on any of theories pleaded as basis for recovery). Appellees argue these claims required proof of actual malice. We agree. "The same protections which the first amendment affords defendants from libel claims also protect them from intentional infliction of emotional distress claims." *Channel 4, KGBT v. Briggs,* 759 S.W.2d 939, 942 (Tex.1988) (citing *Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)). Because we have concluded that summary judgment was proper on the issue of actual malice, summary judgment was also proper on appellants' claims for intentional infliction of emotional distress.

While *Channel 4, KGBT* does not address a claim for tortious interference with employment, appellants have cited no authority to support an argument these claims would not also be subject to first amendment protections when they are based upon a defamatory publication. Appellants do not include any citation to authority in this section of their brief, arguing only "[t]he elements of these causes of action are different than the elements of [appellants'] libel and defamation claims," so that "libel elements and defenses should have no application to these causes of action." *Cf. Moore & Assocs. v. Metro. Life Ins. Co.,* 604 S.W.2d 487, 491 (Tex.Civ. App.-Dallas 1980, no writ) (same limitations period applied to tortious interference claims as to libel claims where tortious interference claims based on same communications and "indistinguishable" from libel claims). We conclude summary judgment was proper on appellants' claims for intentional infliction of emotional distress and tortious interference with employment. We overrule appellants' third issue challenging each ground of the summary judgment.

We affirm the trial court's judgment.