**Affirm in part and Reverse in part; Opinion Filed April 27, 2020.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-00673-CV

**MICHAEL WEBB, INDIVIDUALLY, AND AS REPRESENTATIVE OF THE ESTATE OF WAYNE WEBB, DECEASED, AND AS REPRESENTATIVE OF THE ESTATE OF ROSEMARY WEBB, DECEASED, AND DAVID WEBB, Appellants**
**V.**
**ALFRED W. ELLIS AND SOMMERMAN & QUESADA, L.L.P., Appellees**

**On Appeal from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-17-04251**

## MEMORANDUM OPINION
Before Justices Schenck, Osborne, and Reichek
Opinion by Justice Schenck

Michael Webb, Individually and as Representatives of the Estates of Wayne

and Rosemary Webb, Deceased, and David Webb (collectively, the "Webbs")

appeal a take-nothing summary judgment on their claims against their former

attorney, Alfred W. Ellis, and the law firm of Sommerman & Quesada, L.L.P.

(collectively the "Attorneys"). In three issues, the Webbs claim the trial court erred

in granting the Attorneys summary judgment on the Webbs' negligence and

Deceptive Trade Practices Act ("DTPA") claims. The Webbs do not challenge the

trial court's ruling on their gross negligence claim. For the reasons that follow, we affirm the trial court's judgment as to the Webbs' DTPA claim, reverse the trial court's judgment as to the Webbs' negligence claims, and remand this case to the trial court for further proceedings consistent with this opinion. Because all issues are settled in law, we issue this memorandum opinion. TEX. R. APP. P. 47.4.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 10, 2009, Wayne and Rosemary Webbs' home burned to the ground after a fire started in the laundry room. Wayne was able to escape the fire, but Rosemary was unable to do so and died from smoke inhalation. The fire department concluded the fire started on or near the clothes dryer, but was unable to determine the specific source of ignition.

In April 2010, Wayne and his sons, Michael and David, retained Ellis and his law firm to represent them in connection with Rosemary's death and the property damage occasioned by the fire. They agreed to a contingency fee arrangement whereby the Attorneys would retain forty percent of any settlement or judgment achieved by way of the representation. On behalf of the Webbs, the Attorneys filed a product liability suit against Fisher & Paykel Appliances, Inc., the manufacturer of the dryer, asserting claims of design defect, marketing defect, breach of express and implied warranties, and general negligence. The Webbs sought pain, suffering, and mental anguish damages on behalf of Rosemary's estate by survival action, pecuniary losses, mental anguish, and loss of consortium damages on behalf of

Wayne, Michael, and David by wrongful death action, and property damages for the destruction of the Webbs' home and its contents.

The Attorneys retained Stuart Brozgold, an International Association of Investigators and Certified Fire Investigator, and Derek Geer, a Professional Engineer from Rimkus Consulting Group, Inc., (collectively the "Rimkus Experts") to determine the origin and cause of the fire. On January 11, 2011, the Rimkus Experts provided an "Interim Report of Findings," reaching three preliminary conclusions: (1) the fire originated from the dryer, (2) the building's fixed electrical system was examined and eliminated as an ignition factor, and (3) the washing machine and water heater were examined and eliminated as ignition factors. The Rimkus Experts recommended a further examination of the dryer to determine the specific cause of ignition. In a following report, issued in February 2013, Geer reached ten conclusions, all of which relied on lint within the dryer being the first fuel of the fire. As to possible ignition sources, Geer identified a bearing assembly failure and the dryer's gas blower. While the Rimkus Experts identified *possible* defects within the dryer, in their February report, they did not opine those defects were causes of the fire within a reasonable degree of scientific certainty. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582–83 (Tex. 2006). Thereafter, the Rimkus Experts supplemented the February 2013 report and identified 3 hypothetical causes of the fire (1) the failed bearing hypothetical, which opined that the bearing assembly inside the dryer may have failed, generating heat from friction and igniting lint that

–3–

may have been inside the dryer; (2) the direct contact hypothetical, which opined that enough lint may have gotten inside the burner box itself, come into direct contact with the dryer's gas flame and ignited other lint outside the burner box; and (3) the burner box convection hypothetical, which opined that enough lint may have come into contact with the double walled steel box enclosing the gas burner inside the dryer, and the box may have gotten hot enough to ignite lint that may have been inside the dryer cabinet. These three hypothetical opinions were contingent upon lint build-up in the dryer itself.

Fisher & Paykel moved to strike the Rimkus Experts and filed traditional and no-evidence motions for summary judgment. The Attorneys hired other counsel to work with Geer in preparing an affidavit in response to Fisher & Paykel's motions. In that affidavit, Geer identified two specific design defects within the dryer and found that such defects had more likely than not caused the fire. In addition, Geer identified safer alternative designs. *See Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex. 1999) (plaintiff must prove that there is a safer alternative design to recover under a design defect theory). The trial court denied Fisher & Paykel's motions.

The parties attended mediation during which Fisher & Paykel's counsel stated the Webbs faced problems with the causation element of their claims. This caused Michael Webb to ask Ellis if it would be necessary to retain additional experts to address these alleged problems. Ellis responded that they had all the experts they

needed. The parties did not settle at the mediation, and the case proceeded towards trial.

On April 16, 2015, eleven days before trial was scheduled to commence, Ellis sent the Webbs an email requesting an immediate in-person conference, stating

> We cannot win an appeal because no expert can testify as to the cause of the fire and without that we don't stand a chance. I wish it were different but unfortunately the law is not on our side.

In a separate email, Ellis urged the Webbs to accept a settlement offer because "MOST IMPORTANTLY [they] would have almost no chance of winning an appeal . . . should [they] win the trial." The Webbs settled their claims against Fisher & Paykel for $800,000. Pursuant to the contingency fee agreement, the Webbs received $480,000 of the settlement proceeds and the Attorneys received $320,000.

After settling their claims against Fisher & Paykel, the Webbs still wanted to know what actually caused the fire. They contacted Forensic Action Services and retained James M. Huzdovich, Ph.D., Professional Engineer, Certified Fire and Explosion Investigator, to review and investigate the materials accumulated during the underlying case. After doing so, Huzdovich concluded that a manufacturing defect within the gas valve of the dryer had caused the fire. White-Rogers, a subsidiary of Emerson Electric Co., manufactured the valve.

On April 11, 2017, the Webbs filed this legal malpractice suit.[1]  In their original petition, the Webbs asserted claims of negligence, gross negligence, breach of fiduciary duty,[2] and violation of the DTPA.  The gravamen of the Webbs' initial negligence claim ("Track One negligence claim") was an assertion the Attorneys breached their duty by failing to retain an expert or experts who could identify a design or manufacturing defect to prove their product liability case.  This assertion stemmed from Ellis's April 16, 2015 email concerning the lack of an expert to prove causation.  Thereafter, during the pendency of this case, Ellis claimed his April 16 email was inartfully drawn and that he did not mean that the Webbs could not win on appeal because no expert could testify as to the cause of the fire, but rather was meant to convey that the Webbs could not win on appeal because, per the Attorneys, Texas appellate courts disfavor personal injury cases generally and would likely overturn an award.  Despite any best evidence implications of Ellis's explanation of his intended communication, the Webbs amended their petition to add an alternative negligence theory ("Track Two negligence claim") claiming the Attorneys beached their duty by representing to the Webbs they would not be able to prove causation when they could, and by encouraging them to settle rather than try their case.

---

[1] During the pendency of the case, Wayne passed away and his estate became a party to the suit.

[2] The Webbs later nonsuited their breach of fiduciary duty claim.

On December 14, 2018, the Attorneys filed a no-evidence motion for summary judgment on appellants' negligence, gross negligence, and DTPA claims and a traditional motion for partial summary judgment on the Webbs' DTPA claim asserting that claim is barred by the anti-fracturing rule and is exempt from DTPA liability. The Attorneys also filed a motion to exclude Huzdovich's testimony. On March 1, 2019, the Attorneys filed objections to and a motion to strike the Webbs' summary judgment evidence. On March 4, the trial court heard arguments regarding the Attorneys' motion to exclude Huzdovich's testimony and the next day arguments regarding the motions for summary judgment. The trial court did not rule on the motion to exclude or the objections or the motion to strike, but granted the motions for summary judgment without stating the grounds upon which they were granted. This appeal followed.

## DISCUSSION

The function of summary judgment is not to deprive a litigant of its right to a full hearing on the merits of any real issue of fact, but to eliminate patently unmeritorious claims and untenable defenses. *Murphy v. Gruber*, 241 S.W.3d 689, 692 (Tex. App.—Dallas 2007, pet. denied).

### I.     Negligence Claims

In their first two issues, the Webbs challenge the no-evidence summary judgment on their negligence claims. The purpose of a no-evidence motion for summary judgment is to pierce the pleadings and assess the proof in order to

determine whether there is a genuine need for trial. *Jose Fuentes Co., Inc. v. Alfaro*, 418 S.W.3d 280, 285 (Tex. App.—Dallas 2013, pet. denied). A movant seeking a no-evidence summary judgment need only allege that there is no evidence of an essential element of a claim on which a nonmovant would have the burden of proof at trial. TEX. R. CIV. P. 166a(i); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). Once that occurs, the burden shifts to the nonmovant to bring forth evidence that raises a fact issue on the challenged elements. TEX. R. CIV. P. 166a(i). The nonmovant will defeat a no-evidence motion by presenting more than a scintilla of evidence to raise a genuine issue of material fact. *Id.* More than a scintilla of evidence exists when the evidence rises to a level that would enable fair-minded people to differ in their conclusions. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995). The non-movant need not marshal evidence, but may point out evidence that raises a fact issue on the challenged elements. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 207 (Tex. 2002).

A no-evidence summary judgment is the equivalent to a pretrial directed verdict, and in reviewing the granting of a no-evidence summary judgment, this Court applies the same legal sufficiency standard as applied in reviewing directed verdicts. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). We will thus sustain a no-evidence summary judgment when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c)

–8–

the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).

## A. Applicable Law

To prevail on a legal malpractice claim, a plaintiff must show that (1) the attorney owed the plaintiff a duty, (2) the attorney breached that duty, (3) the breach proximately caused the plaintiff's injuries, and (4) damages. *Alexander v. Turtur & Assocs., Inc.*, 146 S.W.3d 113, 117 (Tex. 2004). If a legal malpractice case arises from prior litigation, a plaintiff must prove that he would have obtained a more favorable result in the underlying litigation had the attorney conformed to the proper standard of care. *Elizondo v. Krist*, 415 S.W.3d 259, 263 (Tex. 2013). The traditional means of resolving what should have happened is to recreate the underlying case. *Rogers v. Zanetti*, 518 S.W.3d 394, 401 (Tex. 2017). This re-creation is typically referred to as the "suit-within-a-suit" and is the accepted and traditional means of resolving the issues involved in the underlying proceedings in a legal malpractice action. *Id.* Where proof of the underlying claims would have required expert testimony, that same testimony is necessary to prove the suit-within-a-suit in the malpractice action. *Kelly & Witherspoon, LLP v. Hooper*, 401 S.W.3d 841, 849 (Tex. App.—Dallas 2013, no pet.). In addition to proving and obtaining findings as to the amount of damages suffered, the plaintiff must prove the damages would have been collectible if the underlying case had been properly prosecuted.

*Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 109 (Tex. 2009).

The suit-within-a-suit implicated by both of the Webbs' negligence claims is a product liability suit. In the case of the Webbs' Track One negligence claim, it involves a hypothetical suit against White-Rogers on a manufacturing defect theory. In the case of the Webbs' Track Two negligence claim, it relates to the Webbs' suit against Fisher & Paykel on a design defect theory.

A manufacturer is strictly liable for a plaintiff's injuries associated with an unreasonably dangerous product if the plaintiff proves the product was defective when it left the hands of the manufacturer or supplier and that the defect was a producing cause of the plaintiff's injuries. *See Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 613 (Tex. 1996); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004); *Carpenter v. Campbell Hausfeld Co.*, No. 01-13-00075-CV, 2014 WL 1267008, at *5 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (mem. op.). A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous. *Id.* A design defect exists if a safer alternative design exists and the existing defect in the design was a producing cause of personal injury, property damage or death. *Sipes v. Gen. Motors Corp.*, 946 S.W.2d 143, 156 (Tex. App.—Texarkana 1997, writ denied).

–10–

Both direct and circumstantial evidence may be used to establish the existence of a defect and its presence at the time the product left the manufacturer or supplier. *See Ridgway*, 125 S.W.3d at 600; *Carpenter*, 2014 WL 1267008, at \*5. Thus, more than a scintilla of evidence necessary to avoid summary judgment on a design or manufacturing defects claim can be supplied through direct evidence, circumstantial evidence, or a combination of both. *See Shaun T. Mian Corp. v. Hewlett-Packard Co.*, 237 S.W.3d 851, 858, 862 (Tex. App.—Dallas 2007, pet. denied).

## B. Track One Negligence Claim

In their first issue, the Webbs assert the trial court erred in granting the Attorneys' summary judgment on their Track One negligence claim, asserting the Attorneys failed to retain experts necessary to support their claim against Fisher & Paykel. As to this claim, the Attorneys asserted the Webbs had no evidence to establish the essential elements of proximate cause, including suit-within-a-suit causation, collectability, and damages. They did not allege a lack of evidence to support a finding of a duty and breach thereof.

In response to the Attorneys' no-evidence motion for summary judgment on their Track One negligence claim, the Webbs relied upon the testimony of Michael Webb, their expert Huzdovich, homebuilder Mel Pollock, legal malpractice expert Kelly Stephens, and Huzdovich's expert reports.

### 1. Product Defect

–11–

The Webbs relied on Huzdovich to establish a product defect to support a hypothetical claim against White-Rodgers under their Track One negligence theory. The Webbs presented evidence of Huzdovich's credentials and qualifications to conduct forensic engineering investigations and fire investigations in order to opine with reasonable scientific certainty as to the proximate or producing cause of the fire event. The Webbs also presented Huzdovich's expert reports and his sworn statements concerning his investigation of the fire and determination of the cause of the fire. At the time of his investigation, Huzdovich had 16 years of fire investigation experience. Huzdovich began his investigation by speaking with Wayne Webb, who reported the presence of flames three feet high coming from the dryer before the smoke detector alarm sounded, and gaining custody of selected evidence collected from the fire scene by the Rimkus Experts. Huzdovich's report detailed the documents he reviewed prior to formulating conclusions in this case, and explained the construction of the dryer. He explained that through forensic investigation, analysis, and testing; and utilization of his experience and the National Fire Protection Association 921 (Guide for Fire and Explosion Investigations); and following the Failure Mode and Effects Analysis ("FMEA"), he was able to develop an opinion on the cause of the fire at issue.

He explained that heat damage patterns and vectors analysis led him to investigate the gas burner assembly, which Huzdovich removed for evaluation. Huzdovich conducted both non-destructive (air pressurization and x-ray) and

destructive testing of the gas burner assembly and valve. Through these tests, he discovered that the valve leaked. He explained that the sequential fastener tightening sequences in assembling the valve caused a stress in the valve body cover plate and the plunger housing guide tubes that resulted in the loss of close operating tolerances of the plungers necessary to maintain a seal. This stress and the resulting loss of close operating tolerances caused a reduction in the seating pressure in both of the valves, eventually causing them to leak.

Huzdovich further explained that the presence of a raised metal gouge in the inlet booster plunger, within a reasonable scientific certainty, resulted in an additional loss of operating tolerance in the inlet booster valve, making it more susceptible to leaking. He concluded this manufacturing defect in the White-Rodgers valve was a producing and proximate cause of the fire event. Huzdovich stated the manufacturing defect more likely than not deviated from the specifications of the manufacturer since the cover plate should have been tightened properly and the solenoid plunger guide tube should not have had noticeable gouges at the time the dryer left the manufacturer. Huzdovich further stated that he considered alternative causes of the fire event, including a lint fire and electrical fire, and they were eliminated due to a lack of supporting evidence and presence of disconfirming evidence.[3] As to fuel for the fire, Huzdovich concluded, given Wayne's report of a

---

[3] Huzdovich explained that the FMEA eliminated the lint removal system failure and the drum bearing failure as a cause of the fire and pointed to the gas valve leak.

loud pop and crackling sound within seconds of hearing the smoke detector and seeing three foot flames, that the dryer released fugitive gas into the dryer enclosure and then was ignited by the dryer's igniter, causing the fire event. We conclude this evidence is more than a mere scintilla to establish a case-within-a-case on a hypothetical claim against White-Rodgers on a manufacturing defect theory. *See Whirlpool Corp. v. Camacho*, 298 S.W.3d 631 (Tex. 2009) (addressing legal sufficiency of evidence of defect); *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549 (Tex. 1995) (outlining factors a court may consider in making threshold determination of admissibility).

### 2. Existence of Defect when the Product Left the Manufacturer

As stated *supra*, both direct and circumstantial evidence may be used to establish a defect existed at the time the product left the manufacturer. *See Ridgway*, 135 S.W.3d at 600. For circumstantial evidence to support such an inference, it must do more than raise the possibility the defective condition could have existed when it left the manufacturer. *Hewlett-Packard*, 237 S.W.3d at 863. It must provide a reasonable basis for concluding the defective condition did not arise subsequent to the manufacturer's exercise of control over the product. *Id.* Sometimes this basis can be provided by evidence of the age of the product and its history of usage up to the time of failure. *Id.* The age and use of a product during the time intervening between its purchase and malfunction will tend to support or defeat the circumstantial weight of the malfunction as proof of the original defect. *Id.* New or

–14–

nearly new products typically have not been modified or repaired. *Id.* Thus, an inference of original product defect may be warranted from the malfunction of a relatively new or sealed product. *See, e.g., Darryl v. Ford Motor Co.*, 440 S.W.2d 630, 632 (Tex. 1969) (three-month-old truck with 600 to 700 miles and no repairs); *Sipes v. Gen. Motors Corp.*, 946 SW.2d 143, 155 (Tex. App.—Texarkana 1997, writ denied) (sealed airbag system in new car).

The evidence presented below showed that Wayne Webb purchased the dryer in October 2008. The fire occurred on December 10, 2009. Thus, the dryer was a little more than a year old when the fire occurred. The dryer contained the valve Huzdovich determined was defective. While other parts had been replaced in the dryer, the valve was not the subject of any repair or replacement. In addition, Huzdovich established the noticeable gouges present in the valve's inlet booster plunger clearly should not have been present and opined that the gouges existed at the time of the gas valve assembly and could not have come from operation of the booster valve. This is more than a scintilla of evidence from which an inference may be drawn to conclude that the valve was defective at the time it left the manufacturer.

### 3. Damages

In addition to establishing the Webbs would have litigated the underlying case to a jury had the Attorneys retained an expert or experts that were able to establish causation, Michael Webb testified as to the damages the Webbs suffered as a result of the fire. In particular, Michael Webb testified regarding personal property lost in

–15–

the fire, rental income lost due to the fire, and the loss of Rosemary's Social Security and retirement benefits. More particularly, Michael stated that he personally assisted in going through a list of personal property lost as a result of the fire and valuing that property and that the value of that property was approximately $506,097.40 in 2015 and approximately $591,372.77 in 2018. He explained that, due to the fire, he and his father had to move into a rental property the family owned. Prior to the fire, the rental property generated rent of $1,000 per month. Thus, from December 2009 through December 2018, the family had lost $120,000 in rental income.

Michael also established Rosemary received approximately $3,000 per month in retirement benefits and $400 per month in Social Security benefits. Records of those payments were attached to Michael's affidavit. The Webbs' legal malpractice expert, Stephens, using Social Security Actuarial Life Tables for a woman Rosemary's age when she passed away (age 86), testified she had a life expectancy of an additional 6.53 years.

The Webbs also presented the affidavit of Mel Pollock, a homebuilder in the Dallas area, in which he testified regarding the costs and expenses that would be required to rebuild the Webbs' home. He concluded the cost would be approximately $1,497,565. Attached to Pollock's affidavit, was a floor plan of the Webbs' home and an itemization of the cost estimates.

Kelly Stephens opined that a jury verdict in Dallas County in the underlying case would more likely than not far exceed $1 million (in the range of $1.5 million

to $2 million) for the death of Rosemary alone.  In reaching this conclusion, Stephens relied on his professional experience of over thirty years as a general practitioner in a variety of legal areas, including product liability and legal malpractice cases, as well as the work of consulting experts Gregory Deans (experienced wrongful death product liability attorney) and Clayton Bailey (experienced appellate attorney), and review of numerous jury verdicts for product liability cases tried to verdict in Dallas County, evidence of which was included in the summary judgment record.  We conclude this evidence is more than a mere scintilla of evidence of the damages suffered by the Webbs as a result of the fire and establishes the Webbs would have obtained a more favorable verdict than the settlement had the case been properly handled.[4]  *See Elizondo*, 415 S.W.2d at 263.

### 4.  Collectability of Judgment

As to the collectability of a judgment against White-Rodgers, the Webbs presented their legal malpractice expert Stephen's testimony that, more likely than not, a judgment in excess of $3 million against White-Rodgers was collectible at the time a judgment in the underlying case would have been final.  In reaching this conclusion, Stephens relied on the 2015 Annual Report of Emerson Electric Co. (White-Rodger's parent company), Emerson's SEC Form 10-K for 1999, and Emerson's Dun & Bradstreet report.

---

[4] In fact, the Attorneys agreed that with legally-sufficient expert testimony, the Webbs could have recovered as much as $3 million from a jury for their product liability claims.

The Attorneys urge the contrary, of course, and rely on *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. National Development & Research Corp.* to argue evidence of Emerson's financial condition is legally insufficient to establish the collectability of a judgment against White-Rodgers. 299 S.W.3d 106, 115–17 (Tex. 2009). *Akin Gump* is distinguishable from this case because there the plaintiff offered the balance sheet of a subsidiary to show collectability of a judgment against the parent company, and the balance sheet contained negative statements regarding the subsidiary's financial condition. *Id.* Moreover, in *Akin Gump*, the court held that collectability of a judgment may be shown in a number of ways. *Id.* at 114. Generally, the amount of an underlying judgment that would have been collectible is the greater of either (1) the fair market value of the underlying defendant's net assets that would have been subject to legal process for satisfaction of the judgment as of the date the first judgment was signed or at some point thereafter, or (2) the amount that would have been paid on the judgment by the defendant or another, such as a guarantor or insurer. *Id.* The court did not state that any specific type of evidence is necessary to make this showing. *Kelley/Witherspoon, LLP v. Armstrong Int'l Servs., Inc.*, No. 05-14-00130-CV, 2015 WL 4524290, at *3 (Tex. App.— Dallas July 27, 2015, pet. denied) (mem. op.).

Here, the summary judgment record contains more than just information concerning the financial health of Emerson. The record also includes a drawing and summary of the characteristics of the valve identified by Huzdovich and identifying

–18–

White-Rodgers *and* Emerson Climate Technologies in connection therewith and that, unlike the financials at issue in *Akin Gump*, Emerson's 2015 Annual Report sets forth financial information concerning Emerson Climate Technologies, including sales of $4.0 billion in 2015, yielding net earnings of $698 million. We conclude this evidence is more than a mere scintilla establishing the Webbs would have been able to collect a judgment on the hypothetical claim against White-Rodgers.

### 5. Causation – Legal Malpractice Claim

As stated *supra*, the Attorneys did not assert a lack of evidence to establish they breached a duty. Whether a lawyer's negligent conduct is the cause in fact of the client's claimed injury requires an examination of the hypothetical alternative: What should have happened if the lawyer had not been negligent? *Zanetti*, 518 S.W.3d at 411.

Stephens, the Webbs' legal malpractice expert, testified the Attorneys should have utilized an expert like Huzdovich to satisfy the required elements and present the underlying case to the jury. As stated *supra*, the Webbs produced more than a scintilla of evidence to establish a case-within-a-case. In addition, the Webbs produced evidence that had the hypothetical case been litigated, the Webbs would have received a verdict that was more favorable than the settlement they accepted. Accordingly, the Webbs produced more than a scintilla of evidence the Attorney's conduct caused them to suffer damages equal to the difference between the damages

that would have been awarded in the hypothetical case and the amount they settled for.

We sustain the Webbs' first issue.

## C. Track Two Negligence Claim

In their second issue, the Webbs assert the trial court erred in granting the Attorneys summary judgment on their Track Two negligence claim—asserting if the Attorneys in fact retained sufficient experts to prove causation, the Attorneys were negligent in advising the Webbs to settle their claim against Fisher & Paykel rather than try the case—the Attorneys asserted the Webbs had no evidence to establish the essential elements of proximate cause, including suit-within-a-suit causation, and damages. Again, they did not assert a lack of evidence concerning the existence of a duty and breach.

In response to the Attorneys' no-evidence motion on their Track Two negligence claim, the Webbs relied on the deposition and/or affidavit testimony of Ellis, the Attorneys' engineering expert Gregory Schober, Geer, the Attorneys' legal malpractice expert Lewis Sifford, and the Webbs' legal malpractice expert.

### 1. Product Defect

The Attorneys' engineering expert, Schober, testified that there was a scientific basis for Geer's failed bearing hypothesis and found that Geer's direct contact and burner box convection ignition theories to be reasonable, thoughtful, and reliable expert testimony on causation. Schober further testified that Geer was

qualified to testify on the origin and cause of the fire, that he agreed with Geer's conclusion that the failed bearing assembly ignited lint, causing the fire, and that Geer followed the Guide for Fire and Explosion Investigations. Thus, through Schober, the Webbs presented more than a scintilla of evidence that Geer was competent to provide expert testimony concerning a design defect and that his opinions were legally sufficient to support the Webbs' claim against Fisher & Paykel. *See Camacho*, 298 S.W.3d 631; *Robinson*, 923 S.W.3d 549.

In addition to Schober's testimony, the Webbs presented deposition testimony from Ellis and Sifford and the affidavit of Geer. Ellis testified his comment concerning not being able to prevail on appeal was, despite the language in the email, actually unrelated to the retained experts and that Geer's opinions were not the problem, rather it was his perception that the appellate court would take away a jury verdict due to their disfavor of personal injury claims. Sifford opined that Geer's testimony was admissible under Texas law, acknowledged that the trial court denied Fisher & Paykel's motion to strike Geer in the underlying case, in which they challenged the legal sufficiency of Geer's opinions, and indicated that he did not disagree with the trial court's ruling on the motion, thus conceding the legal sufficiency of Geer's opinions.

In his affidavit, Geer set forth his qualifications to conduct forensic and mechanical investigations post-fire to determine if defects within electrical systems or appliances contributed to the cause of a fire. In addition, he set forth his

methodology and described the design and workings of the dryer. Geer then discussed in detail the defects in the lint filtration collection system and the bearing assembly.[5] He concluded that to a reasonable degree of scientific certainty one or both of the defects ignited the fire and discussed his convection and burner box theories. Finally, Geer addressed alternative designs and stated that a majority of dryers have flat lint screens that have no mechanical scraping mechanism applying frictional and physical force to the screen, like the Fisher & Paykel dryer, and there are bearing assemblies that do not depend as heavily on the technical complexity of the oil impregnated brass bearing assembly. We conclude this evidence is more than a mere scintilla to establish the existence of a design defect that was a producing cause of the fire to satisfy the suit-within-a-suit requirement for the Webbs' Track Two negligence claim.[6]

The Attorneys contend that in addition to proving the case-within-a-case causation, the Webbs had to establish the verdict would have been upheld on appeal

---

[5] We acknowledge that Huzdovich and Geer have different opinions concerning the defect that caused the fire and that at this juncture the Webbs rely on both to support their alternative claims. If both negligence theories are presented at trial, the jury will determine whose opinion, if either, it finds credible. *See Creech v. Columbia Med. Ctr. Of Las Colinas Subsidiary, L.P.*, 411 S.W.3d 1, 15 (Tex. App.—Dallas 2013, no pet.) ("It is particularly within the jury's province to weigh opinion evidence and the judgment of experts.").

[6] While the Webbs also pleaded breaches of warranties, and marketing defect in the underlying case, they concede that they did not argue any of those claims in their response to the Attorneys' no-evidence motion for summary judgment. They relied solely on their design defect theory in responding to the Attorneys' motion as to their Track Two negligence claim. Thus, the Attorneys' complaint concerning the Webbs' failure to mention and provide evidence concerning a breach of warranty and marketing defect are of no consequence here.

because they are complaining about his advice concerning success on appeal. In doing so they rely on an appellate legal malpractice case. *See Millhouse v. Wiesenthal*, 775 S.W.2d 626 (Tex. 1989). The Webbs are not complaining about an attorney's professional negligence in handling an appeal, thus, *Millhouse* is distinguishable from the current case. Nevertheless, the legal standards governing the sufficiency of the evidence are the same in the trial court and the appellate courts, and the Attorneys' perception that appellate courts disfavor product liability cases is unsupportable and inconsequential to our analysis here.

## 2. Existence of a Defect when the Product Left the Manufacturer

As noted *supra*, the record establishes the dryer was barely more than a year old at the time of the fire. The record further establishes that, before the fire, the dryer was serviced and a bearing and idler pulley and drum belt tensioner were replaced. We note that one of the defects identified by Geer was a bearing assembly, which may have nothing to do with the replaced bearing. Given the relative age of the dryer and the fact that the dryer has several bearings, we conclude there is more than a scintilla of evidence from which an inference may be drawn to conclude that the bearing assembly identified by Geer was the original bearing assembly and was defective at the time it left the manufacturer. *Hewlett-Packard*, 237 S.W.3d at 863.

## 3. Damages

The claimed damages under the Webbs' Track Two negligence claim are identical to their Track One negligence claim. As stated *supra*, the Webbs produced

more than a scintilla of evidence concerning the damages they suffered as a result of the fire.

### 4. Causation

The Webbs' legal malpractice expert, Stephens, testified that he is familiar with the standard of care of investigating, proving, working up, prosecuting, litigating, and arguing a case to a jury, including product liability cases. Stephens testified that, if Geer's opinions met the applicable legal standards, which we conclude the Webbs presented evidence they do, a reasonably prudent attorney in Ellis's position would have litigated the underlying case to a jury. Stephens further testified that Ellis's failure to do so was negligent and proximately caused damages in the amount of the difference (discussed above) between the value of the Webbs' settlement with Fisher & Paykel and the amount that would have been awarded at a jury trial if the Webbs had been properly represented. Evidence of those damages is discussed *supra*. We conclude the Webbs presented more than a scintilla of evidence of causation and damages to defeat the Attorneys' no-evidence challenge to their Track Two negligence claim.

We sustain the Webbs' second issue.

### D. DTPA Claim

In their third issue, the Webbs challenge the trial court's grant of the Attorneys' traditional and no-evidence motions for summary judgment on their DTPA claim.

–24–

When a party files both a traditional and no-evidence motion for summary judgment, we must uphold the summary judgment if it can be sustained under either method. *Ketter v. ESC Med. Sys., Inc.*, 169 S.W.3d 791, 799 n.3 (Tex. App.–Dallas 2005, no pet.). Although when both no-evidence and traditional summary judgment motions are filed we usually address the no-evidence motion first, *see Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004), here we will review the propriety of granting the traditional summary judgment as to the Webbs' DTPA claim first because it is dispositive. *See* TEX. R. APP. P. 47.1.

A traditional summary judgment motion may be granted when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." TEX. R. CIV. P. 166a(c); *Tex. Commerce Bank, N.A. v. Grizzle*, 96 S.W.3d 240, 252 (Tex. 2002). To defeat a plaintiff's cause of action on a traditional motion for summary judgment, a defendant must either conclusively negate at least one element of each of the plaintiff's theories of recovery or conclusively establish each element of an affirmative defense, thereby rebutting plaintiff's claim. *Pollard v. Hanschen*, 315 S.W.3d 636, 638 (Tex. App.—Dallas 2010, no pet.). A matter is conclusively established if ordinary minds could not differ as to the conclusion to be drawn from the evidence. *Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 577 (Tex. App.—Dallas 2007, no pet.). The court examines the entire record in light most favorable to the non-movant. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 219 (Tex. 2017). When, as here, the trial court does not

–25–

specify the grounds upon which the summary judgment was granted, this Court will affirm the judgment if any of the theories advanced are meritorious. *Kastner*, 231 S.W.3d at 577.

In support of their traditional motion for summary judgment, the Attorneys argued that the Webbs' DTPA claim should be dismissed because (1) it is nothing more than an impermissible division or fracturing of the Webbs' professional negligence claims, and (2) the professional-services exemption bars liability in this case.

Professional negligence, or the failure to exercise ordinary care, includes giving a client erroneous legal advice or otherwise improperly representing the client. *Newton v. Meade*, 143 S.W.3d 571, 574 (Tex. App.—Dallas 2004, no pet.). For example, a lawyer can commit professional negligence by giving an erroneous legal opinion or erroneous advice, by delaying or failing to handle a matter entrusted to the lawyer's care, or by not using a lawyer's ordinary care in preparing, managing, and prosecuting a case. *See, e.g.*, *id.*

Texas courts do not allow plaintiffs to convert a duty in negligence into a claim for fraud or violations of the DTPA. *Won Pak v. Harris*, 313 S.W.3d 454, 457 (Tex. App.—Dallas 2010, pet. denied). For the anti-fracturing rule to apply, however, the gravamen of appellants' complaints must focus on the quality or adequacy of the attorney's representation. *Murphy v. Gruber*, 241 S.W.3d 689, 692–93 (Tex. App.—Dallas 2007, pet. denied). Whether certain allegations asserted

–26–

against an attorney and labeled as a violation of the DTPA is, in actual substance, a claim for professional negligence is a question of law to be determined by the court. *Murphy*, 241 S.W.3d at 692. To support additional causes of action, the court must find that the underlying facts implicate independently actionable obligations or duties. *Beck v. Law Offices of Edwin J. (Ted) Terry Jr. P.C.*, 284 S.W.3d 416, 428 (Tex. App.—Austin 2009, no pet.). The Webbs' DTPA claim asserts the Attorneys:

- falsely represented that they were prosecuting the Webbs' wrongful death and survival case against Fisher & Paykel;

- failed to disclose that they did little investigation or discovery involving the causation of the fire;

- falsely represented that the Webbs' case was being prosecuted when essentially no product liability experts were retained to prove causation;

- falsely represented that the Rimkus Experts could prove causation which they could not;

- failed to disclose that the Rimkus Experts could not prove that a defect within the dryer caused the fire after they issued their reports and were deposed;

- failed to disclose the Webbs' case being subject to a probable directed verdict and/or not surviving an appeal was due to the Attorneys' mishaps;

- falsely represented at mediation that there were no problems with the Rimkus Experts proving causation and that the Webbs did not need to retain any additional experts;

- failed to timely disclose that the Attorneys allowed the expert designation deadline to lapse without retaining a product liability expert to prove causation;

- falsely represented that the Attorneys' were experts in personal injury and product liability cases and were experienced lawyers; and

- falsely represented after mediation that the Webbs' case was going well and the Webbs had nothing to worry about.

Each of these allegations complains about one or more of the following: giving an erroneous legal opinion or erroneous advice, failing to give any advice or opinion when legally obligated to do so, delaying or failing to handle a matter entrusted to the attorney's care by the client, and not using an attorney's ordinary care in preparing, managing, and presenting litigation that affects the clients' interests. On this record, we conclude the Webbs' DTPA claims are barred by the anti-fracturing rule. *See e.g., James v. Witherite*, No. 05-17-00799-CV, 2018 WL 5869641, at *8 (Tex. App.—Dallas Nov. 9, 2018, no pet. (mem. op.). We overrule the Webbs' third issue.

## CONCLUSION

We reverse the trial court's summary judgment on the Webbs' Track One and Tract Two negligence claims and affirm the trial court's summary judgment on the Webbs' DTPA claim. We remand this case to the trial court for proceedings consistent with this opinion.

/David J. Schenck/
DAVID J. SCHENCK
JUSTICE

190673F.P05

–28–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MICHAEL WEBB,
INDIVIDUALLY, AND AS
REPRESENTATIVE OF THE
ESTATE OF WAYNE WEBB,
DECEASED, AND AS
REPRESENTATIVE OF THE
ESTATE OF ROSEMARY WEBB,
DECEASED, AND DAVID WEBB,
Appellants

No. 05-19-00673-CV     V.

ALFRED W. ELLIS AND
SOMMERMAN & QUESADA,
L.L.P., Appellees

On Appeal from the 134th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-17-04251.
Opinion delivered by Justice
Schenck. Justices Osborne and
Reichek participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's judgment granting summary judgment in favor of appellees on appellants' negligence claims. In all other respects, the trial court's judgment is **AFFIRMED**. We **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 27th day of April, 2020.